Our next case for today is United States v. Mohsin and Khan, numbers 18-1275 and 18-1598. We'll hear first, as I understand it, from Mr. Leonard. Good morning. May it please the Court. Mike Leonard on behalf of Appellant Ruby Mohsin. I'll only be addressing the sentencing estimates motion. Mr. Tunick will be addressing the issues with respect to Mr. Khan. The first issue for the Court is whether the District Court properly applied the enhancement under 2B.1.1.B.15a. As the Court knows, the issue was whether Miss Mohsin's conduct evidenced a conscious or reckless disregard that created the possibility of death or serious bodily injury to the consumer. And the District Court's opinion with respect to this issue is flawed in various respects. And what the District Court did is set pages 103-114 of the January 26, 2018, sentencing hearing, which was the last one. And what the Court did was first find that Miss Mohsin, who is simply a 55-year-old woman with no medical background, training or experience, possessed specialized knowledge of prescription of its analysis of its enhancement. So the foundational prong for the Court was that this person has specialized knowledge of prescription drugs. And that was based upon the fact that her son had cancer, and she helped him take his medications, and that she took medications herself. So there was absolutely no basis for this fundamental prong to his analysis in the first instance. Moreover, that's not relevant to whether she had knowledge that her The Court then further failed by taking the next step in its analysis, which was saying that repeatedly, including in those nine pages and throughout the various transcripts, this is a controlled substance. This is a Schedule I controlled substance. This is an illegal drug. This is an unlawful drug. And repeatedly stopping the proceedings to read from Miss Mohsin's plea to make the point that she had pled guilty to knowledge of intentionally distributing a controlled substance. She didn't. She pled guilty to a misbranding case. So he then took that prong and he said, gee, someone with specialized knowledge of prescription drugs, which is a false premise, how would they act when consumers came to this store, the cigar box? What would they do in her shoes? And he goes through an analysis of, gee, she's not asking the customers their sensitivities to dosages. She's not asking them how frequently they take this, all based upon the flawed premise that she knows it's a controlled substance. It's undisputed that she had no such knowledge and did not plea to that. Mr. Leonard, the only, the one fact that I'd like you to respond to, the only fact that I I'm not in any way sure that it does, but I want to get your reaction to it. Sure. Comes in the course of Janice Smith's testimony, which I know you have issues with. Okay. But she does testify, does she not, that her own son had a terrible experience a few days before and that she had to bring him to the hospital because of it. And I'm looking on, I'm looking at the, if you get to the Smith direct testimony, you know where I'm at. Sure. You're probably at page 13. Yep. 14 and 15. Right. I thought that would come up, Judge. Yeah. She, what she says was, is very important. Her words, I remember telling her, Ms. Motion, do you know how dangerous this stuff is and what this is doing to people that are smoking it? She makes that statement. However, Your Honor, as you have She admits that in a deposition in 2013, shortly after these events, she testified under oath that Kevin Smith's incident episode, whatever you want to call it, had nothing to do with Ms. Motion's product or Ms. Motion's store, which becomes an important issue for this court because what the disreport did then, as you know, is he refused to allow counsel to cross-examine the witness on these issues. So as you recall, he then allows only what we'll call a partial proffer. I'll call it a false proffer because what he did was he stopped the cross-examination in the middle at a, at a early point and said, we're done. Witness can leave the stand. He literally said that. And then when counsel tried to make a proffer, he said repeatedly to him, I've already made a credibility finding. I've already made it. You can make your She's credible. So counsel then was able to get into the record, at least the fact she had testified at a, at a deposition under oath and that she admitted this had nothing to do with Ms. Motion's product or store. However, the judge wouldn't consider that because he already told counsel repeatedly, I've already made a finding of credibility, but it's worse when counsel tried to make a record of an offer of proof, which we have to do because if we're before this court, you would say, where's your offer of proof? He attempted to make an offer of proof and the judge gave what I will call a threat. He told him that at page 46 of the second hearing, that this is the last warning that if you do not move on to another area, meaning don't give me an offer of proof so we can preserve it for appeal on this only witness who's relevant to the important issues, as justice pointed out, I will stop your presentation and get to the ultimate sentencing in this case. Meaning if you try to make an offer of proof, you try to make a record on the only witnesses relevant, I'm going to sentence your client right now. That is not fundamental fairness. That is not due process. We understand that at the sentencing hearing, our right to cross examination is somewhat diminished, but the concept is still fundamental fairness. You can't say I'm not going to hear it from you. I'm not going to let you make an offer of proof. And what's worse, your honors, is that if you read the transcript, you'll know that earlier the judge did something that is remarkable and unprecedented. I've never seen it. I don't think you have either. Counsel is giving his argument. He brought in U.S. Marshals as a means to stop him from making this particular offer of proof with respect to Ms. Smith has to be viewed against a backdrop of earlier proceedings. The judge brought in U.S. Marshals to restrain the attorney for making offers of proof. That is not fundamental fairness by any measure. Mr. Leonard, isn't the risk of serious physical injury the reason that misbranding of drugs is a crime? I don't think so, Judge. What do you think is the reason? I think that every misbranding case is based upon the premise that typically it's not for human consumption or it's an unknown quantity. So one might try to make the argument, well then, if you don't know the ingredients, if it's not for human consumption, should the enhancement apply? The enhancement doesn't apply to every single misbranding case. Under your argument, Judge, or the extension of it, every single misbranding case would in and of itself mean you get the enhancement, which is not the standard and which is not how the courts view it. The courts say you have to look at the individualized circumstances of the misbranding case and see, does this particular defendant, confronted with what they know and what they're on notice of, do they have, are they putting someone at risk of death or serious bodily injury? And what I think happened here, Your Honors, is we get to the third prong of the judge's analysis, which what he did was at page 112 of his opinion, which is the last sentencing hearing, he worked backwards. So he says the right things for the record. He says this is not a foreseeability analysis, but then he does exactly that. He looks at this as a car accident case and at page 112 makes these statements that she knows that the majority of these young people come to the mall using motor vehicles and they'll leave by motor vehicles. So there's not only a risk of harm, risk of bodily harm or injury or death to the purchaser because they're driving a car, but also to others that the purchaser might encounter them on the road. He's not making the proper analysis. The analysis is the particular substance at issue, does she have notice that that substance, whatever her knowledge is, would possibly create death or serious bodily harm? You can't work backward from the result and then say, gee, we had a car accident, so therefore it makes the standard. I'd also like to... Is there anything else you... I'd like to reserve rebuttal. You've used up your time, but you'll have an opportunity. Thank you. Then next we'll hear from Mr. Tunick for Mr. Kahn. May it please the court, your honors, counsel, my name is James Tunick and I represent Mohamed Kahn. Your honors, I am seeking a reversal of Mr. Kahn's sentence and the extraordinary remedy of an immediate order releasing him from federal custody. Mr. Kahn should have been sentenced at an offense level of eight with significant mitigating circumstances and 3553A factors. A level eight being the lowest offense in the 24 years that I've practiced in this building. That's where he should have been sentenced. The plea agreement called for a level eight. It made no mention of any reckless or conscious disregard for death or bodily injury. There was no mention at the change of plea hearing of any facts related to that at the plea colloquy in the plea agreement. It was only enhanced at his sentencing. There was absolutely no evidence that the enhancement under United States sentencing guideline 2B1.1B15A should have applied to Mr. Kahn at all. He was not, as the court has mentioned, the one fact that Janice Smith conversation, Mr. Kahn was not privy to at all. There was no evidence that that conversation, if it occurred, which of course I wasn't at that allowed to cross-examine Mrs. Smith. I wasn't at that sentencing hearing. I was not given that Sixth Amendment right to cross-examine her. But nevertheless, there was no evidence he was privy to that conversation, that that information was informed. So that leaves us with absolutely no evidence that this enhancement should apply. But I'd like to get into more specifics. Specifically, the law states, or the federal sentencing guideline states, a conscious or reckless risk of death or serious bodily harm. The government never took the position that it was a conscious disregard of death or bodily harm. The analysis then focuses on whether it was a reckless risk of death or bodily harm. And the parties do not disagree about the law in this respect. As the government even cited in its brief, this court has interpreted reckless in the context of the guidelines 2B1.1B15A, the defendant must be aware of the risk created by his conduct. Again, there was no evidence that Mr. Kahn was subjectively aware of any risk created by the misbranding. And let's not forget, he was a part-time cashier at this cigar box. He only worked when the owner's son developed a form of cancer. He worked there for a very short period of time, part-time. So with respect to the enhancement, I submit there was no evidence. The government threw out certain things at the sentencing hearing. And I think the judge kind of fell into that, which was the death of Max Dobner. It was the elephant in the room. But there was no evidence that Mr. Kahn knew about the death or the cause of the death or anything of that nature. And then they also talked about a WBBM news report. Again, no evidence that Mr. Kahn was aware of it, had any notice of it in any case where the enhancement is completely lacking any evidence. Mr. Tunick, you've made this unusual request. Could you spell out the chronology that you think supports it for immediate release? Well, because of the... When did he report? I'm sorry. He was sentenced to 10 months, correct? He was sentenced to 10 months. Okay. He reported in July. I sought an extension of the surrender date in the district court, was not objected to by the government, but the district court refused to extend his surrender date. Then I actually came, I filed an emergency motion in this court, before the Seventh Circuit, to extend his surrender date. I also filed a motion for bond pending appeal, which was denied. But his surrender was in July, Your Honors. Okay. Thank you. I'm sorry. And if he were offense level eight, what would the range have been? It would have been zero to six months. And there was significant mitigating factors. There's significant 3553A factors in this case. He was 67 years old. He had no prior criminal history. He has five children. One was special needs. There was no economic benefit from selling this misbranded drugs. The government prosecuted people who manufactured, produced, in stores that sold, that received an economic benefit. But Mr. Kahn didn't receive any economic benefit. He had, as I previously stated, he took the position as a cashier, just because, as the owner's son, developed a rare form of cancer. The store had been open for many years before that. Thank you. Thank you, counsel. I would like just to ask one question. It's just very brief. Are you saying in some way that the judge took into consideration what he may have heard in the motion? Absolutely. And then applied it to him? Absolutely. He even indicated that on the record. I'm just, I thought I heard you say that. I don't know what the issue was, but maybe it's he assumed that Kahn had the same information. I'm not sure if that's what you're saying. He indicated, I'm sorry, he indicated that he believed they had an intimate relationship, despite there was no evidence of that. But he did indicate on the record that he did take into consideration evidence that was deduced from this motion's hearing. And I'll save the rest for rebuttal, but I would just like to indicate one other thing. If you look at the court's reasoning itself, what the court said is that Mr. Kahn consciously disregarded what he might have learned. And that is completely an opposite of what the guideline says. It's a conscious disregard of a known risk, not a consciously disregard of what he might have learned, if you look further. But thank you, Your Honor, I'll save the rest for rebuttal. Okay, thank you, counsel. Mr. Schneider for the government. Thank you, Your Honors. May it please the court, Matthew Schneider, of the United States. Your Honor, to address your question to Mr. Tunick, this court has held that evidence presented in another sentencing proceeding may be used to determine a co-defendant's sentence, as long as that co-defendant has an opportunity to rebut the evidence or generally cast doubt on it. And that was this court's decision in the Kootz case back in 1992. And that certainly was the case with regard to Defendant Kahn. He had an opportunity to address all the matters that were raised at motion and sentencing hearing, which proceeded before his own. And yet we submit he failed to address those. With regard to the enhancement for conduct involving the conscious or reckless risk of death or serious bodily injury, the district court did not clearly err in applying this enhancement. With regard to Defendant Motion, indeed, it was Janice... Which one are you talking about? Let me make it clear. Who are we talking about? Ruby Motion, Defendant Ruby Motion, and the enhancement under 2B 1.1B 15A. Okay, thank you. Yes, sir. Janice Smith was a retired nurse who went to the cigar box, this shop in the Fox Valley Mall in February or March 2011, and had a 25 minute conversation with Defendant Motion where she warned him, warned her about the terrible effects that these synthetic drugs, the synthetic marijuana was having on the young people who were buying them and smoking them. She related her own experience with her own son, who had smoked these substances, and had to go to the hospital. She testified that indeed she found her son bent over, frozen, couldn't speak, with the eyes in the back of his head. Called 911, the paramedics took him to Central DuPage Hospital where he received care. She went to the cigar box and issued this warning to Ruby Motion, and it was weeks later, indeed months later, that she continued to sell these products, these dangerous synthetic drugs, and when she sold them to Max Dabner and his friend Emily Mueller. Less than two hours later, Max Dabner was dead when he drove his car into a house at high speeds, having suffered a panic attack. Mr. Schneider, you have your red brief there. I do. Yeah, can you take a look at page 22 of the brief? This strikes me as an important statement, and I want to ask you if you're sure it's accurate. In the middle of the page there, you see the sentence that says, the evidence that sentencing showed? Yes. About the middle of the page? Yes, I do, Your Honor. That Ms. Smith, Janice Smith, made Motion aware of the risk of selling synthetic marijuana, the point you just made, and Dabner's death. Where did Janice Smith testify that she made Perhaps the sentence wasn't as artfully constructed as it should have been, but I think it reads, Ms. Smith made Motion aware of the risk of selling synthetic marijuana, and Dabner's death and the other's experience ingesting these products or products established, the risk was real. That was the point we sought to make. That is that she made her known, gave her notice of the serious risk of death or serious bodily injury. Indeed, that turned out to be the case when Max Dabner died shortly after ingesting Iaroma Hypnotic that he purchased from Ruby Motion. Indeed, Ruby Motion talked Dabner and her friend, his friend, into buying the products, saying that there was a sale, two packages, buy two packages, you get another one free, offer $20, and these were just one gram packages of synthetic drugs and drug suggestive packages with catchy names directed to appeal to young people. How do you defend the complete shutdown of the cross-examination? Because I understand why you put weight, as you do, on the testimony of Ms. Smith, but the transcript shows a complete cutoff of the cross-examination. Right. Judge, it's our position that the cross-examination, in the cross-examination council, had an opportunity to show a bias or motive that Ms. Smith had. The fact was she was a pure... But how, though, given the points that your adversary would have brought out, had Judge Norville permitted him to continue the cross-examination? Right. There was an opportunity to conduct some impeachment, and council did that with regard to the civil deposition Ms. Smith gave in 2013. And our point is that the only impeachment available was on a collateral matter with regard to what happened at the hospital when Ms. Smith brought her son there after succumbing to the adverse effects... But wouldn't it have come out on cross that she wasn't even there? She didn't see her son's eyes roll back in his head. I believe... I mean, that was the point of the cross-examination that was curtailed. My sense was the point of the cross-examination was that she did not share with the emergency room staff the fact that her son had smoked these products, the synthetic marijuana, and was having a poor reaction. I mean, he'll have a minute here, a second, a few minutes here, but I thought his point was that Smith had tried to portray to Judge Norville that she was present for these issues with her own son when, in fact, cross-examination would have exposed that she was not. I thought it was clear from Ms. Smith's testimony that she experienced firsthand the he appeared frozen, if you will. That's the term she used, and that she called 911, and they went to the hospital. But the problem the defense had was that, well, wait a minute, you didn't tell the emergency room staff that he had smoked this marijuana? But she clarified that she spoke to her son's psychiatrist, because he had a psychiatrist, and she shared that information with her. Our point is that there was impeachment. There was an opportunity to establish that her prior statements of Ms. Smith were before the court. That is her affidavit from 2012, her civil deposition from 2013, her grand jury testimony from 2015, and, His Honor, the district court judge heard her in his courtroom on January 4th, 2018. And the judge was in a position to evaluate her credibility, and he found her believable. He credited her testimony. She was a fact witness with no stake in the outcome of this litigation. She came forward with this information that was relevant to the case. And in each of those other statements, under oath, she was consistent with regard to her warning to Ms. Motion that these were dangerous products that were having terrible effects on young people who came to buy them and use them in her store. In cars, if you will, because this is a shop in the Fox Valley Mall. The customers are coming and going in cars, and indeed, that's what Max Dobner did. He and Emily Mueller went to the parking lot, smoked the Iroma, hypnotic, and within 90 minutes, he was dead. Mr. Schneider, a couple of questions. Did you want to comment on Ms. Marshall's incident? Judge, I would. That would have occurred on the first day of the proceeding when witnesses were in the courtroom, ready to be called, and the judge wanted to proceed to taking testimony. And I think as it occurred, and as is reflected in the transcript, counsel wanted to persist in making an argument that the judge was not prepared to hear at that time, wanted to hear witnesses who were here from out of town. And when counsel did not abide by the admonition of the court and persisted in presenting an argument, the judge asked him to sit down. When he refused to sit down, the marshals were called. One marshal was called, and in turn, the defense attorney sat down. And with respect to the reckless disregard of risk enhancement, apart from Ms. Smith's testimony and evidence, which has these issues surrounding the cross-examination, apart from her evidence, what's the best evidence that these defendants were aware of the risks posed by the substances they were selling for human consumption? Okay. Well, with regard to motion, of course, Ms. Smith's explicit warning... Subtract Smith. Right. Then with regard to a defendant con judge, he made admissions that he had talked to customers who came to the store about the different highs that these substances provided. And they discussed and had a conversation with regard to the different highs that these substances produced. Mr. Kahn admitted he observed older people coming into the cigar box, the smoke shop in the mall, and buying these products for younger people who were waiting outside the store in the mall. He said that he, in motion, knew that the customers were smoking these products. He said that the profits were very good. They were purchased for about $3 a package, and they could be sold for $10, $15. Even if we grant you all that, though, how does that speak to the risk issue that the enhancement requires? Well, I believe it speaks to it, Judge, because it's about... He was aware that the customers, these young customers, were buying it. They were smoking it. They were coming to and from the mall in cars, which put them and others at risk, as the district court noted. And with regard to his knowledge, he continued to sell these products in a surreptitious manner long after Dobner died. It was in August of 2011, weeks after Max Dobner's death, when he sold Head Trip and Cush Potpourri to an undercover Aurora police officer from a container concealed under the counter of the store. And between Max Dobner's death and the sale, there had been this CBS report with regard to the sale of these products at the Cigar Box. There was extensive news coverage of Max Dobner's death. His mother testified. She appeared on television programs. She gave interviews to the newspapers. And yet, Mr. Kahn continued to sell, and his sales from these products concealed under the counter speaks to not only his knowledge of the illicit nature of the products, but also the risk involved. And as the district court said, Motion and Kahn were selling time bombs to these young customers at their store. And with regard to the cross-examination, if I may, counsel for Motion had an opportunity to make his offer proof. He made his offer proof, and he returned to this collateral matter of what Ms. Smith told the emergency room staff at the Central DuPage Hospital at no time during his sentencing hearing spanned three days, November 15, 2017, January 4, and January 26, 2018. He had a full opportunity to establish that Ms. Smith's account was unreliable. But the fact is she had given consistent statements with regard to her warning. The warning was explicit, but it wasn't Mr. Kahn was aware himself with regard to the nature of the store and his activities there. With regard to the enhancement, the PSR found, I'm sorry, the probation officer writing the pre-sentence report found that the enhancement was appropriate and applicable in this case. The sentence, the parties in their sentencing memos addressed it, and the judge applied it under the fraud guideline, 2B1.1. The court understood the dangerous nature of these products and the risks the defendant's conduct posed to the customers, and the enhancement was properly applied. Kahn had full opportunity to rebut any of these matters, failed to do so. With regard to the transcript from the sentencing hearing, but its question is what other encounters earlier to explore a lot of this occurred somewhere else, right? Before we get into the sentencing, actual sentencing, you mentioned your depositions and some other things that occurred before that. Yes, yes. And I guess we can look at whatever else they're trying to raise or bring up. It was more in Moten's argument with the judge than it was with Kahn. He didn't, there wasn't a lot of confrontation there. No, and we submit that Ms. Smith's version of her warnings and her encounter with Ms. Moten was uncontroverted, and she'd been consistent over a series of six years with regard to this. Telling us stuff somebody should have known, I guess, is what you're saying. Yes, I do believe that that's the case. With regard to 3553 factors, the court found that the need for a general deterrence outweighed these personal factors, and he acknowledged these personal factors with regard to the defendant's families and the fact that their close relationships with the families. This was noted and credited, but in imposing a low and guideline sentence on Kahn and a guideline sentence on Moten, the court acted properly and there was no procedural error in the imposition of sentence. We submit, if there aren't any further questions, your honors, that we respectfully ask that the court affirm the judgment of the district court in this case. Thank you, Mr. Schneider. Mr. Leonard, Mr. Tunick, one minute each for rebuttal. I'm sorry, Judge, I believe I have two minutes, if that's okay. I think that was scheduled for two. You had used up all of the time. I'm sorry. With regard to the Ms. Smith issue that you raised, your honor, respectfully counsel, I was absolutely wrong. At page 43, when Mr. Chandra attempted to make an offer of proof, which was rejected and told it would not be considered, he attempted to get into the record, which the court wouldn't consider, this colloquy from her deposition testimony. This is page 43 of the second sentencing transcript at line 17. Was that incident you're referring to now any different than any prior incident where you saw him under the influence, or was this something more dramatic? Answer, that day I was working. I wasn't even there. So counsel is not only not able to get that into the record and have it considered by the court, he's told preemptively that a decision has already been made on credibility and bias and you can't consider any other evidence. It's directly on point. Also, your honor, the question is whether it's a gross deviation from the standard of the care. Therefore, this court is required to consider the circumstances surrounding this motion at the time. The evidence is unrebutted that the Aurora Police Department regularly, unannounced, would come into her store all the time and that an individual officer would make personal purchases in there. None of them thought there was anything untoward about what was going on. None of them give him any warnings. And furthermore, for the deviation argument, your honors, Mr. Johnson from the Kane County Sheriff's Department goes to the store one month, or I'm sorry, 10 days after the death of Mr. Dobner. Goes in there, doesn't tell Miss Motion about the death, says he's conducting an investigation and it's unrefuted that even he doesn't think anything that's untoward is going on. He doesn't bring to Miss Motion's attention, gee, there might be something wrong with these products or dangerous about these products. So considering the entire context... You've now had two minutes. I'm sorry. Thank you, Mr. Leonard. Am I done, your honor? You're done. Thank you. Thank you for your time. And Mr. Tunick. Thank you, your honors. When the court questioned Mr. Schneider about whether there was any evidence that Mr. Kahn was aware of the risk, he cited to the fact that he sold these packages of potpourri under the counter after Max Dobner died. Now I would ask you to look at the government's brief on page 27. That was their position. At the time of the sale, Kahn retrieved the package of drugs from a box, hid it under the counter. Yet there's no citation to the record. No one testified to that. I'm not even certain where the government is getting that evidence from. It might have been from something proffered to the pre-sentence report, but they never took that position at any point, and they don't even cite to the record in their brief as to that particular issue. He was not aware of any risk, and even assuming that to be true, that he sold a package from underneath. That does not create a knowledge, a mens rea, of this substantial risk of death or bodily harm. It indicates that he might have sold a package, but I ask the court again to refer to the government's brief where they got that evidence from. Okay. Thank you very much, Mr. Tunick. Thank you, Judge. Cases are taken under advisement.